**1198**

**GRIDIRON STEEL COMPANY,**
Plaintiff,

v.

**GEUDER, PAESCHKE & FREY COM-
PANY, Defendant.**

Civ. A. No. 66–C–39.

United States District Court
E. D. Wisconsin.

Jan. 21, 1970.

Elwin A. Andrus, Milwaukee, Wis., and Harold K. Bell, Robert J. Fay and David B. Deioma, Cleveland, Ohio, for plaintiff.

Maxwell H. Herriott and Donald G. Casser, Milwaukee, Wis., for defendant.

## OPINION AND ORDER FOR JUDGMENT

REYNOLDS, District Judge.

Plaintiff, Gridiron Steel Company ("Gridiron"), is a patent holding corporation organized and existing under the laws of the State of Ohio and having its principal office and place of business at Cleveland, Ohio. Defendant, Geuder,

Paeschke & Frey Company ("Geuder"), is a corporation organized and existing under the laws of the State of Wisconsin having its principal place of business at Milwaukee, Wisconsin.

This court has jurisdiction based upon diversity of citizenship and the amount in controversy which, exclusive of interests and costs, exceeds $10,000.

Gridiron seeks to recover damages for the breach of a patent license agreement between it and Geuder which relates to metal ironing tables. The license agreement was executed in 1940 and was amended in 1947 and in 1950.

The royalties claimed under this agreement are predicated on four patents* relating to metal ironing boards, which patents were in effect when the controversy arose. The validity of these patents is not an issue, and the parties have stipulated that for the purposes of this litigation, it may be assumed that the tables involved are covered by these patents.

Geuder had never manufactured ironing tables of any construction prior to 1940.

This matter was tried to the court without a jury. Based upon the evidence presented at trial, the extensive stipulation of facts filed by the parties, and the exhaustive briefs submitted by counsel, herewith is my decision and findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## ROYALTIES

This dispute involves three types of ironing table tops. Geuder manufactured and sold these tables under numerous model numbers. For convenience, these tables will be described and referred to by the exhibit numbers used throughout this lawsuit.

The top of Exhibit 5 is known as a full grid top and has a single top metal

---

* Patent No. 2,215,918 issued September 24, 1940; Patent No. 2,233,735 issued March 4, 1941; Patent No. 2,263,765 issued November 25, 1941; and Patent No. 2,319,397 issued May 18, 1943. All of the patents claim two metal sheets.

sheet. The bottom structure of Exhibit 5 has a sheet with longitudinal channels pressed out of their normal plane to form rigid braces. The lower sheet is attached to and supports the upper sheet.

Exhibit 5 was sold under two trademarks: (1) MET–L–TOP as Model Nos. C–605, C–607, and C–680, and (2) GLIDE EASY as Model Nos. P–510, P–610, and P–620.

The top of Exhibit 10 has a top sheet identical to that of Exhibit 5. The bottom structure of Exhibit 10 was basically the same as Exhibit 5 except that some center portions of metal were removed from between the longitudinal channels. Exhibit 10 was sold under the trademark GLIDE EASY as Models C–608 and C–609.

The top of Exhibit 11 has an identical top as that of Exhibit 5 and Exhibit 10 except that the channels of the under structure are transverse instead of longitudinal. Exhibit 11 was sold under the trademark GLIDE EASY as Model Nos. C–150, P–101, and P–100.

The issue is which, if any, of the clauses in the 1950 amendment to the licensing agreement are applicable to the table tops in dispute.

Gridiron claims that all of the table tops involved here were covered by this agreement. Geuder claims that the disputed table tops are not covered by the contract, or, if they were, then they are "other tables" as to which the parties specifically left the royalty fee to future negotiation. The 1950 amendment to the 1940 license agreement reads as follows:

"December 31, 1950

Geuder, Paeschke & Frey Company
324 North Fifteenth Street
Milwaukee 3, Wisconsin

Gentlemen:

In the contract between Gridiron Steel Company and Geuder, Paeschke & Frey Company cancel the first full paragraph of section 4, as revised in February 1947, and substitute therefor the following:

'4. Geuder agrees to pay Gridiron a royalty fee on ironing tables embodying ironing table tops sold under this contract in the year 1950 from the date of this revision and each calendar year thereafter as follows:

1. Competitive Table
(Not to carry G. P. & Frey "Met-L-Top" name)          Straight
No. P 510                                             Royalty          .05

2. Present Tables

No. P 600   Non-Adj.   $7.95—Average $4.25
No. A 606   Adj.Leg.   $8.95—Base $4.00—2½%                           .10
3. New Fully Adjustable
(Stand-up—Sit-down)    $12.95—Base $6.00—2½%                          .15
No. C 680

4. Electric with Adjustable Leg—G. P. & F. to furnish us for campaign purposes—with cost and profit statement then— our royalty to go up or down as they may have to go up or down 20% to be raised or lowered on same percentage as their profit raises or lowers.
No. E 601                                                             .20

5.  Electric Table with Fully Adj.
    Stand-up Sit-Down legs       $17.95
    No.  E 601              9.00   Base—$3\frac{1}{3}\%$    .30'

In Nos. 2 and 3 the base price on which the royalty has been figured at $2\frac{1}{2}\%$ is to go up or down with changes in the retail sales price of the tables. As an example, if the base price of tables Nos. P–600 and A–606 change from $7.95 and $8.95 to $8.95 and $9.95 then the base price shall change from $4.00 to $4.50 and the base price of Nos. 3 and 5 will change in the same manner with the change in the retail price of the article.

In the event that other tables are to be made, then in each such case a new royalty rate shall be agreed upon between the parties, such royalty to be based approximately on the present schedule as outlined above.

Executed in duplicate, this 31st day of December, 1950 and effective as of the 26th day of April, 1950.

                                        (Corporate Seal)

Attest:          GRIDIRON STEEL COMPANY

/s/  Thos. H. Fay     By  /s/  Horace B. Fay
           Treasurer.                           President

                                          (Corporate Seal)

Attest:          GEUDER, PAESCHKE & FREY COMPANY

/s/  H. J. Stephany    By  /s/  August K. Paeschke
                                            President"

---

The 1950 amendment does not list every type and model manufactured by defendant.

Geuder asserts that the 1950 royalty schedule is not enforceable as to any models not specifically referred to in that amendment. The basis of this position is that (1) one or two model numbers are included in each of five clauses setting forth the various methods of royalty computation, and (2) the concluding clause of the 1950 amendment states:

"In the event that other tables are to be made, then in each such case a new royalty rate shall be agreed upon between the parties, such royalty to be based approximately ·on the present schedule as outlined above."

Geuder further takes the position that *any* ironing table not specifically mentioned in the 1950 amendment is an "other table" as to which no royalty is due until agreed upon by the parties.

The conduct of the parties is relevant to determine what classification they intended to apply to the various types and models.

Commencing in May 1954, and up to September 1, 1957, when Geuder sold its rights under the license agreement to Jones & Laughlin Steel Corporation, Geuder made 405,439 ironing tables composed of all three types and numerous models on which royalties were not paid.

After the 1950 amendment, and up to September 1, 1957, Geuder paid Gridiron royalties on tables with tops of the type in Exhibit 5. Some of these tables had been sold under the trade name of "MET–L–TOP" at a "fair trade" price, and as to these, the royalty paid was $2\frac{1}{2}\%$ of the base price which Geuder charged its customers. Other of the Exhibit 5 types of tables were marketed

under the trade name of "GLIDE EASY," and as to these a royalty of $0.-05 per table was paid.

Geuder's records for 1955, 1956, and 1957 show that tables having Model Nos. P–610, P–620, C–608, C–609, C–150, P–101, and P–100 were listed as "promotional" with a $.05/table royalty opposite the model number and the amount of units produced. As seen from the 1950 amendment, the category of "competitive tables" in the 1950 amendment is the only one for which a $.05/table royalty is due. All of these models listed as promotional were marketed under the trademark "GLIDE EASY." Geuder paid royalties on various models of ironing tables which were not listed in the 1950 amendment, e. g., the C–605 and C–607 tables.

For a period of time Geuder paid $.05/table royalty on the C–608 and C–609 ironing tables. A credit was subsequently taken by Geuder for the royalties paid on the C–608 and C–609 tables for the express reason that they were not covered by the patents now in suit.

Geuder itself equated one of the inexpensive GLIDE EASY tables, the P–510, listed as "competitive" in the 1950 amendment with promotional type tables listed in its records. It did so in one of its brochures where it states:

"Here is a brand new G. P. & F. ironing table * * * the model P–510 'GLIDE EASY'. It is our answer to the call for a *good,* low-price, promotional type table."

Gridiron previously instituted a suit against Geuder's assignor of the license in suit, Jones & Laughlin Steel Corporation ("J & L"), in the Northern District of Ohio, Eastern Division, Civil Action No. 35,145, seeking *inter alia* recovery of royalties under the license agreement and obtained a judgment against J & L for $.05/table royalties based upon J & L's production of the C–150 tables (Exhibit 11) which were also produced by defendant. Gridiron Steel Co. v. Jones & Laughlin Steel Corp., 142 U.S.P.Q. 264 (N.D.Ohio 1964), aff'd 361 F.2d 791 (6th Cir.1966). It was there specifically held that the lower structure of Model C–150 (Exhibit 11) was a discontinuous sheet. The Sixth Circuit Court of Appeals found that the C–150 was a competitive table for which a $.05/table royalty was due.

Gridiron, on June 27, 1956, wrote to Geuder concerning the absence of royalties on Model Nos. P–610 and P–620. Geuder answered by letter of July 2, 1956, that those models had been discontinued. Geuder's records produced at the trial indicated that production on the P–610 and P–620 continued during this time. Geuder's records also show that at various times during the period of 1955 through 1957, royalties were not paid on different tables having the top of Exhibit 5. Particularly, royalties were not paid on production for the C–680 table in June 1956 nor for the C–605 table from June 1956 through January 1957 nor for the C–607 from January 1957 through June 1957. No notice was ever given to Gridiron concerning the halt of such payments. The C–680 tables were classified in the 1950 amendment as a fully adjustable table with a royalty of 2½% of the base price of $6.00. The C–605 and the C–607 tables had a base price of $5.00 and a royalty of 2½% of the present table was due.

Geuder's records show that the C–605 and the C–607 tables were listed with their list price, base price, and number of units produced in the same manner that all other "present" or "fully adjustable" tables were listed in the 1950 amendment. This is in contrast to the manner in which the competitive or promotional tables were listed. They had no stated list or base price but simply a notation of ".05" which denoted the royalty per table.

The parties operated under the 1950 amendment for a substantial period of time after it became operative. Geuder paid royalties on tables which were not referred to by specific model number in the amendment, and kept records which are consistent only with the conclusion that the 1950 amendment was *not* limit-

ed to only those model numbers specifically referred to in the amendment.

■ I find that the parties did not contemplate renegotiation of the royalty schedule every time a new model—which may have been merely a new color of table—was introduced. Rather, the parties intended to renegotiate in the event other patents were obtained by Gridiron, or perhaps in the event Geuder developed a model drastically different in features and price from any of the types then being produced by them.

The conduct of the parties pursuant to the agreement, especially the conduct of the defendant Geuder, establishes that the 1950 amendment is sufficiently definite to be enforceable. I further find that none of the tables involved in this action were "other tables" within the meaning of the contract.

I conclude that:

■ 1. Geuder breached its contract with Gridiron by not paying royalties on ironing tables manufactured under Gridiron's licensed patents.

■ 2. Geuder used the trademark "GLIDE EASY" to represent inexpensive tables which fall under the category of a competitive table with a $.05/table royalty in the 1950 amendment. What is known as a competitive table in the 1950 amendment is listed as a promotional table with a $.05/table royalty in Geuder's records. Competitive or promotional was used by Geuder in the sense to mean less expensive tables than the other models it made.

3. Ironing tables having Model Nos. P–610 and P–620 which have the table top of Exhibit 5 and the tables having Model Nos. C–608 and C–609 which have tops of Exhibit 10 and ironing tables having Model Nos. C–150, P–101, and P–100 which have the table tops of Exhibit 11 are competitive tables, and a $.05/table royalty is due under the 1950 amendment to the 1940 license between the parties. The number of competitive tables for which royalties are due is 393,010. At $.05/table, the amount of royalties due on competitive tables is $19,650.50. Simple interest at the rate of 5% is due and continues to run on the royalties for competitive tables from the time when the tables were manufactured. The interest on all competitive tables, i. e., C–150, C–608, C–609, P–100, P–101, P–610, and P–620 to December 31, 1968, amounts to $12,029.43. Royalties plus interest totals $31,742.93.

4. Geuder has effectively admitted that the C–608 and C–609 tables having the top of Exhibit 10 are competitive tables by paying, even temporarily, the competitive $.05/table royalty. Geuder's reason for taking a credit on the C–608 and C–609 royalty payments was because such tables were not covered by the patents, but it has now stipulated to the contrary.

5. The earlier decisions of Gridiron Steel Co. v. Jones & Laughlin Steel Corp., supra, that the C–150 model (Exhibit 11) is a competitive table having two sheets and a royalty of $.05/table is due is persuasive. The listing of an exemplary model number under the heading of "competitive table" does not in any way limit the type of such table or affect the applicability of the earlier *Gridiron* case.

6. Geuder misled Gridiron concerning the production of tables having Model Nos. P–610 and P–620 in its letter of July 2, 1956, when it stated that those models had been discontinued.

7. Royalties on the C–605, C–607, and C–680 tables having the table top of Exhibit 5 are due at the rate of 2½% of the base price as shown in Geuder's records. Five percent simple interest is due on these tables from the time of their production and continues to run. The amount of such royalties due is $1,625.02. Five percent simple interest from the production of the tables to December 31, 1968, is $964.50 which makes a total of $2,589.52. The grand total of royalties and interest to December 31, 1968, on all tables amounts to $34,332.-45.

■ No notice was given to Gridiron concerning the production of Exhibit 5

tables having Model Nos. C–605, C–607, and C–680 on which Geuder knew royalties were due. And since Geuder actively misled Gridiron on the production of P–610 and P–620 tables, it maliciously breached the contract. Therefore, attorney's fees are awarded to Gridiron.

■ 8. None of the tables in suit fall under the second last paragraph of the 1950 amendment which refers to other tables. However, if they did, the contract would still be definite since that paragraph refers to the earlier listed categories within the same amendment. These categories set forth sufficiently definite criteria by which the parties could determine any royalty due. Geuder dispelled any doubt about the definiteness of the criteria for calculating royalties by determining them on the C–605 and C–607 tables which were not listed in the 1950 amendment.

If any "other" tables were made under the 1950 amendment, Geuder had a duty to so notify Gridiron since Geuder clearly had the better knowledge of their structure. Geuder did not give any such notice.

## STATUTE OF LIMITATIONS

In 1940, defendant Geuder executed a license in which it would manufacture ironing tables under the patents owned by Gridiron. That license was duly signed by the president of each party. Their signatures were notarized, attested, and had an acknowledgment of authorization from the board of directors. A notarial seal and the signatures of the parties are shown. In addition to the acknowledgment and notarization of the corporate signatures, the corporate seal of each corporation was placed on the contract.

In 1947, the amount of royalties was amended. In that amendment the presidents of each party again signed the document, corporate seals of each party were attached, and there was an attesting signature for each of the signing presidents. From the correspondence between the parties, both Gridiron and Geuder were very conscientious and careful to make sure that all the copies had the corporate seals attached thereto. The new royalties were acted on from a period of 1947 to 1950 when again the contract was amended.

The 1950 amendment which was quoted above had the signatures of each of the presidents and corporate seals of the signing parties. Moreover, each of the signing presidents had their signatures attested. A letter from Gridiron sent to Geuder made a definite point of requiring that the change be signed and sealed with the company seal. In response to Gridiron's letter, Geuder responded in a letter of February 16, 1951, that the amendment had been signed and affixed with Geuder's official company seal. The royalties stated in this amendment were acted on for a period of about five years.

This 1950 amendment was in a form of a letter, and Gridiron stated that the new paragraph on royalties was to be *substituted* for the royalties as revised in 1947.

Robert J. Fay, President of Gridiron, testified that the reason for using corporate seals was because the documents were being executed as sealed instruments.

The applicable statute of limitation is Wisconsin Statute 893.16. It states:

"Within 20 years:

*     *     *     *     *     *

"(2) An action upon a sealed instrument when the cause of action accrues within this state * * *."

Wisconsin Statute 990.01(37), published May 29, 1951, defines a sealed instrument. It states:

" * * * An instrument executed in the corporate name, by the proper officers of a corporation, under any seal is sealed even though the corporate seal is not used * * *"

Wisconsin Statute 991.07, published May 29, 1951, specifies which statute of limitation should apply. It states:

"In any case when a limitation or period of time prescribed in any act which is hereby repealed for the acquiring of any right or the barring of any remedy or for any other purpose shall have begun to run and a limitation or period of time for such purpose shall be prescribed in these revised statutes, the limitation or period prescribed by these statutes shall be held to apply only to such rights or remedies as shall accrue subsequently to the time when the same shall take effect; * * *."

Geuder gave and Gridiron accepted royalties according to the schedule set forth in the 1950 amendment from the date thereof until 1955 when Geuder took a credit on the C–608 and C–609 (Exhibit 10) ironing tables. Thus, this cause of action arose at the very earliest in 1955 which was after Wisconsin Statutes 990.01(37) and 991.07 were published.

Nonpayment of royalties on the Exhibit 5 tables, having Model Nos. P–610, P–620, C–605, C–607, and C–680, was not known until after this suit began.

I conclude that:

■ 1. Wisconsin Statute 991.07 requires that the relevant statute of limitation is Wisconsin Statute 990.01(37), since it was the one in effect when the cause of action accrued.

■ 2. Under Wisconsin Statute 990.01(37), the 1940 license and the 1947 and 1950 amendments are sealed instruments. Although the corporate seals with the signatures of the parties were sufficient to create a sealed document, the signatures were also attested or witnessed. In the 1940 license, the signatures were also notarized and acknowledged.

3. As seen from the formalities used by the parties, the care taken in executing this document, and Fay's testimony, it was the intent of the parties to create a sealed instrument. These agreements were complex, involved a substantial business venture, and were negotiated at length prior to their execution; they were in fact more than simple contracts. It is not essential that a sealed instrument contain a recitation that it is under seal. Fond du Lac Citizens Loan & Inv. Co. v. Webb, 240 Wis. 42, 1 N.W.2d 772, 2 N.W.2d 722 (1942). As sealed instruments, the 1940 license and 1947 and 1950 amendments have a twenty year statute of limitation on which suit may be brought.

4. No part of Gridiron's action is barred by any statute of limitation since this action was instituted within twenty years of the time it accrued, which was at the earliest in 1955.

5. Since Gridiron had no notice previous to the institution of this suit that royalties were not paid on the production of Model Nos. C–680, C–605, C–607, P–610, and P–620, the statute of limitation is not in issue with respect to these tables.

6. The amendments of 1947 and 1950 did not constitute new contracts. They were modifications of the original sealed 1940 contract, and this suit was predicated on that instrument as amended.

7. Since the 1950 amendment merely modified the 1940 contract by the substitution of royalties and was acted on by the parties for a period of about five years, the amount of formalities used in the 1950 amendment is not pertinent. It was not necessary that the 1950 amendment be sealed, although it in fact was sealed. Thus, Gridiron had twenty years in which suit could be brought from the time the cause of action accrued. Since twenty years has not elapsed since this cause of action arose, Gridiron is not barred by the Wisconsin Statute of Limitations.

8. Suit was brought by Gridiron for a breach of contract and not for infringement; therefore, the federal statute of limitations for infringement is irrelevant to this proceeding.

## 1206

### LACHES

On October 26, 1955, Gridiron wrote to Geuder concerning the royalty credit taken by Geuder for the C–608 and C–609 ironing tables. In this letter, samples of the C–608 and C–609 tables were requested since Geuder alleged they were not covered by the licensed patents. Fay testified without contradiction that the C–608 and C–609 tables were never received.

On June 27, 1956, Gridiron requested information on royalties of certain ironing tables having Model Nos. P–610 and P–620. In this letter a tour of Geuder's plant was also requested. In response to this request, a representative of Geuder wrote that the production of those models had stopped and that no outsiders would be permitted in the plant. Geuder's records, discovered in this litigation, show that the production of Model Nos. P–610 and P–620 continued during this time and after.

Fay testified that during the remainder of 1956 and during 1957, he continued in his attempt to discuss the matter of payment of royalties with Geuder but was rebuffed in his attempt.

On January 7, 1957, Gridiron wrote Geuder suggesting a meeting with the management in Chicago. On January 9, 1957, Fay received a letter from Mr. Gordon, President of Geuder, arranging a meeting at the convention in Chicago, Illinois. Fay testified that he was rebuffed in all attempts to meet with Geuder's personnel.

On September 1, 1957, Geuder transferred to J & L the entire ironing table business, including the tools and dies for manufacturing Models C–690 (Exhibit 5) and C–150 (Exhibit 11). Moreover, J & L was assigned and assumed the obligation of Gridiron's license agreement.

Immediately following the transfer of the ironing table business and license to J & L, a controversy developed with Gridiron concerning the payment of royalties on certain ironing tables. As a result they were in constant negotiation with J & L in an attempt to settle the differences. After March 4, 1958, J & L refused to pay any further royalties despite their continued manufacture of the metal ironing tables.

In June 1958, J & L without any previous notice to plaintiff sold the entire ironing table business, including the tools and dies, to Arvin Company. Plaintiff continued to meet with J & L over a period of time in an attempt to negotiate a settlement based on J & L's sales to Arvin. All attempts at settlement with J & L broke down, and a complaint was filed on February 24, 1959, against J & L in the United States District Court, Northern District of Ohio. That litigation proceeded continuously through the District Court of the Northern District of Ohio and the Sixth Circuit Court of Appeals until it was finally settled on December 31, 1966.

In 1964, a suit was also filed against Arvin but was settled in 1965.

On December 31, 1965, less than one month after the Arvin settlement and while the J & L suit was still pending, Gridiron notified Geuder that it had reason to believe that Geuder had not paid all royalties due under the license and that Gridiron wanted to exercise its right under the license to inspect the relevant records and printed books. Geuder refused Gridiron's request in its letter of January 19, 1966.

Gridiron filed this suit on February 8, 1966.

Geuder acted on advice of its own patent counsel when it notified Gridiron on October 6, 1955, that the tables having Model Nos. C–608 and C–609 were not covered by the license.

In 1956, Geuder changed the structure of its tables from that of Exhibit 10 (Model Nos. C–608 and C–609) to that of Exhibit 11 (Model No. C–150).

Geuder as the manufacturer of the tables had much better access to information concerning the tables than Gridiron.

I therefore conclude that:

■ 1. Gridiron was legally excused for not suing Geuder at an earlier date.

Its activity in other litigation against Geuder's assignee of the license in suit is a legal excuse for not proceeding against Geuder at an earlier time.

2. Gridiron was diligent in pursuing its rights under the license against Geuder. After the sale of the ironing table business to J & L on September 1, 1957, Geuder could not be legally damaged. Interests on the damage under the contract are not considered sufficient damage for the sake of laches.

3. Geuder did not act upon any representation of Gridiron, nor was it damaged by the time lapse in bringing suit. Any delay between 1955 and 1957 was primarily caused by Geuder's own reluctance in forwarding Girdiron models of the C–608 and C–609 tables, failing to give Gridiron notice of the production of the C–150 tables, and denying the production of the P–610 and P–620 tables when confronted with a letter of inquiry.

Lacking an unexcused or unexplained delay and a detrimental reliance on that delay, laches is not a bar to Gridiron's suit on the patent license.

Gridiron had no duty to request a new royalty rate on any of the tables in suit. The tables were covered by one of the categories in the 1950 amendment for which a definite royalty was already specified. Moreover, if any table had required a new royalty rate, then it was the duty of Geuder, as the party with better access to the pertinent information, to so notify Gridiron. Geuder never requested a new royalty rate of Gridiron or even notified Gridiron of a requirement for one. Geuder's claim of laches because Gridiron did not request a new royalty rate therefore fails.

Gridiron is entitled to royalties and interest on the tables in suit, as noted above, along with attorney's fees, disbursements, and costs.

For the foregoing reasons,

It is ordered that judgment for the plaintiff, Gridiron Steel Company, be entered in accordance with this opinion.