529 P.2d 1270

H. M. CHASE CORPORATION, a corporation, and Thelma D. Chase, Individually, and as special Administratrix of the Estate of Henry M. Chase, also known as H. M. Chase, Deceased, Plaintiffs-Appellants and Cross-Respondents,

v.

IDAHO POTATO PROCESSORS, INC., an Idaho corporation, and H. J. Heinz Company, a Pennsylvania corporation, Defendants-Respondents,

and

Ore-Ida Foods, Inc., an Oregon corporation, and Ore-Ida Foods, Inc., a Delaware corporation, Defendants-Respondents, and Cross-Appellants.

No. 11041.

Supreme Court of Idaho.

July 12, 1974.

Rehearing Denied Sept. 6, 1974.

Langroise, Sullivan & Smylie, Boise, Wood, Herron & Evans, Cincinnati, Ohio, for appellants.

Hawley, Troxell, Ennis & Hawley, Boise, Parmelee, Miller, Welsh & Kratz, Pittsburgh, Pa., Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., for respondents.

DONALDSON, Justice.

In 1949, Henry Chase filed two applications for patents with the United States Patent Office. The actual contents of the two applications will be discussed in detail later, but briefly they described a process for the preparation of frozen potato products. The two patents were subsequently issued to Chase on May 20, 1952.

In December, 1952, Chase and Ore-Ida Potato Products Inc., of Oregon, entered into a license agreement whereby Ore-Ida was authorized to use the patented processes in its plant at Ontario, Oregon, in return for an agreed upon royalty based upon the amount of production. In 1953, this agreement was modified to give Ore-Ida an exclusive three year license.

In 1957, Chase entered into a second license agreement with Idaho Potato Products, Inc. (I.P.P.I.) covering its plant in Burley, Idaho. In 1960, Ore-Ida constructed a plant of its own in Burley. In 1964, Ore-Ida purchased the I.P.P.I. plant at Burley and constructed another plant in Michigan. Also in 1964, Henry Chase transferred all his rights in the license agreements to the H. M. Chase Corporation. In 1965, the H. J. Heinz Co. through its wholly owned subsidiary, Ore-Ida Foods, Inc., a Delaware Corporation, purchased the assets of Ore-Ida Potato Products, Inc., an Oregon Corporation. In order to avoid confusion, Ore-Ida of Oregon then changed its name to the H. O. I. Corporation. Royalties were paid on the potato patties and frenci cut potatoes produced at the Ontario plant until this action was filed. In addition, I. P.P.I. paid royalties on the production at its Burley plant. However, no royalties were paid on any production at any of the other plants. The I.P.P.I. agreement was not acquired by Ore-Ida when it purchased I.P.P.I. The plaintiffs, in their suit, contend that the defendants are liable for royalties for production at all of the plants.

Plaintiffs brought suit on June 30, 1965, and the trial court ruled that any claim plaintiffs may have had for years prior to June 30, 1960, was barred by the statute of limitations. Plaintiffs-appellants assigned this ruling as error.

■ The trial court based its ruling on the five year statute of limitations for actions on a written contract found in I.C. §

5–216, which the parties stipulated would be applicable in this case. Suits brought to enforce patent license agreements are governed by general contract law. Rubens v. Bowers, 136 F.2d 887 (9th Cir. 1943); Farmland Irrigation Co. v. Dopplmaier, 48 Cal.2d 208, 308 P.2d 732 (1957). Therefore, the applicable state statute of limitations is determinative. Gridiron Steel Co. v. Geuder, Paeschke & Frey Co., 308 F.Supp. 1198 (E.D.Wis.1970).

■ Appellants contend that the five year statute of limitations is not applicable, arguing that the amounts due were unliquidated, that the agreements had not been repudiated, and that it would have been impossible for them to prove anticipatory damages with any accuracy. However, the license agreement called for installment payments to be paid on the 10th day of each month for the production of the preceding month and royalties were paid on two products produced at the Ontario plant. Thus, the amount due and owing and due each month was ascertainable and would be a proper basis for proving anticipatory damages. Therefore, the statute of limitations began to run on each installment as it became due.

"Where money is payable in installments, the statute of limitations begins to run against a cause of action for the recovery of a delinquent installment as of the time it becomes due. Bank of America v. McLaughlin, 152 Cal.App.2d Supp. 911, 313 P.2d 220 (1957); Lee v. DeForest, 22 Cal.App.2d 351, 71 P.2d 285 (1937); American Mutual Bldg. & Loan Co. v. Kesler, 64 Idaho 799, 137 P.2d 960 (1943). Consequently, the five-year statute of limitations had barred the corporation's action for recovery of the 1957 installment as of the time the corporation commenced its action against "Harper." Cassia Creek Reservoir v. Harper, 91 Idaho 488, 492, 426 P.2d 209, 213 (1967).

Thus, there was no error in the ruling of the trial court.

■ Appellants have also assigned as error the refusal of the trial court to admit certain documents relating to negotiations between the parties. Appellants apparently desired the court to consider these documents when it ruled on respondents' motion for summary judgment. However, appellants have not made any argument as to why the documents should have been admitted or how they would have been relevant to the issue of whether the statute of limitations had run. Therefore, we cannot say that the trial court erred in refusing to admit them. Supreme Court Rules, rule 41(2); Church v. Roemer, 94 Idaho 782, 498 P.2d 1255 (1972).

■ The trial court also granted summary judgment in favor of the defendants-respondents as to any claim the plaintiffs-appellants had for production at the two Burley plants and the one in Michigan, thereby restricting plaintiffs' cause of action to the production at the Ontario plant. Appellants argue that the production at the two plants constructed by the defendant H.O.I. in Burley and Michigan was covered by the original license agreement covering the Ontario plant. The original 1952 license agreement contained the following two provisions:

"(1) The Licensor hereby grants to the Licensee a license from the date hereof and for the term of the aforesaid Letters Patent, or any reissue, diversion or extension thereof, to USE said Patent Process and Method and to produce potato products and sell and distribute them thereunder within the United States, and/or any Foreign Country. If Licensee desires to extend their operations to plants other than the present Ontario Plant, they may do so by obtaining an additional license permit from Licensor for each and every other location desired, on the same basis as the within license terms and conditions.

"(4) Licensee hereby covenants and agrees that during the life of this license they will diligently and continuously

manufacture, sell and market in and through their own plant, the products contemplated under the within license, and Licensee shall exert their best efforst [sic] to create a demand therefore and to increase and extend their business and to supply the demand of said products."

Appellants rely on De Forest Radio Telephone & Telegraph Co. v. United States, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927) and Lukens Steel Co. v. American Locomotive Co., 197 F.2d 939 (2d Cir. 1952) as authority that the license was extended to the other two plants because appellants knew of the plants, did not object to them, and repeatedly demanded payment for the production therein. However, neither of those two cases are applicable here in as much as they dealt with the issue of whether the owner of a patent may sue for infringement after he has acted in such a manner to indicate that he acquiesced in the use of the patent. In both those cases, the court found an implied agreement by the owner of the patent not to sue for infringement. Neither case involved an implied agreement by the alleged infringor to pay royalties.

■ The only evidence in the record concerning any agreement on the part of H.O.I. Corp. to pay royalties was the deposition of Henry M. Chase wherein he stated that he had demanded royalties and that H.O.I. Corp. had refused to pay them. H.O.I. never agreed that it was bound by the license agreement with Ore-Ida. According to the terms of the license agreement, H.O.I. could have obtained additional licenses had they so desired. They did not do so and the trial court was correct in granting summary judgment in favor of the defendants as to those claims. It may be that plaintiffs can sue H.O.I. for patent infringement, but jurisdiction of that cause is exclusively in federal courts. 28 U.S.C. § 1338(a). In this suit, appellants had to prove that a contractual agreement for the extension of the license existed and they have failed to do so.

As to the Burley plant, constructed by I.P.P.I. and later acquired by H.O.I., appellants contend that the defendants are obligated to pay royalties under the original I.P.P.I. agreement issued in 1957. Appellants acknowledge that the license agreement stated that it was not assignable without the consent of both licensor and licensee in that the agreement by which Ore-Ida, later H.O.I., acquired I.P.P.I. specifically excluded from the transfer the license agreements. Appellants argue that the duties under the license agreement passed to H.O.I. by operation of law because H.O.I. and I.P.P.I. merged. Respondents argue that the transaction was merely the acquisition of one corporation's assets by another and because the agreement between H.O.I. and I.P.P.I. specifically excluded the license agreement, Ore-Ida did not assume any obligations under the license.

■ There is no evidence in the record to support appellants' theory that the two corporations merged. In a merger, two or more corporations merge into one surviving corporation. The other ceases to exist. Henn, Handbook of the Law of Corporations, 2d Ed. (West, 1970). In this case, I.P.P.I. sold most of its assets to Ore-Ida in return for cash, Ore-Ida stock which later became H.O.I. stock, and promissory notes. I.P.P.I. continued to exist, its assets consisting of what it received from Ore-Ida and the Chase license agreement. Thus, there was merely a sale of assets, because the agreement transferring the assets specifically excluded from the transfer the license agreement and because patent licenses are not assigned without express words of assignment. The Troy Iron & Nail Factory v. Corning, 14 How. 193, 14 L.Ed. 383 (1852). The patent license was not transferred to Ore-Ida and Ore-Ida had no obligations to pay royalties under the agreement. Therefore the trial court correctly granted defendants' motion for summary judgment with respect to plaintiffs' claim for royalties on the I.P.P.I. plant in Burley.

The remainder of appellants' assignments of error pertain to the actions of the trial court in deciding whether the processes used by defendants were within clims 4, 5 and 6 of plaintiffs' patents. In the process of obtaining a patent, the applicant files with the patent office a description of his invention, together with drawings and one or more "claims" in which he points out and "claims" the subject matter of his invention. The application is then examined by a patent office examiner who can either accept or reject the application. If the examiner objects to the whole application, or any part thereof, he has the duty to point out to the applicant his objections. The objection can either be to the form of the application or that the invention consists of prior art (prior patents and literature). The applicant then is given an opportunity to amend his application to overcome these objections. Several such amendments may be required before the application is finally accepted and the patent issued.

If, after the patent is issued, it appears that the patentee has claimed more or less than that to which he is entitled, he is permitted to apply for a reissue. If allowed, the original is reissued with a new number.

In determining whether a product or process is covered by a patent or patents, each claim is considered separately. If the product or process falls within the "claim," then it is covered by the patent, assuming the patent is valid. In his reissue patent No. 23,890, Henry Chase made the following "claim" for

"(4) In a process for preparing and preserving white potatoes for subsequent cooking, which process includes quick freezing of cut pieces at temperatures below zero degrees F., the preliminary step of treating the potatoes in the form of cut uncooked pieces in rapidly agitated fresh water thus removing excess outside starch to prevent the pieces from sticking together, then blanching the pieces, and then subjecting the pieces to forced circulating air to reduce their moisture content to less than that of freshly cut, untreated potatoes."

The jury sustained appellants' claim that the production of "tater tots" [1] was within the scope of claim 4. However, the trial court then granted respondents' motion for judgment notwithstanding the verdict. The reason given by the court for granting the motion was that there was no evidence in the record establishing the moisture content of the raw potatoes, the moisture content after the potatoes had been blanched in water, or the moisture content after they were exposed to forced circulating air.

In order to recover, the appellants have the burden of proving that the process used by respondents to produce tater tots was within the scope of the claim. New Wrinkle, Inc. v. John L. Armitage & Co., 277 F.2d 409 (3d Cir. 1960). That each and every step, or its equivalent, described in the claim was practiced by the respondents and that the results stated in the claim were achieved by the respondents. Therefore, in order to recover appellants had the burden of proving that respondents, in the production of "tator tots," washed uncooked pieces of potatoes in rapidly agitated fresh water to remove outside starch so as to prevent the pieces from sticking together, then blanched the pieces and then subjected them to forced circulating air and reduced their moisture to less than the moisture content of freshly cut, untreated potatoes.

The evidence in the record shows that in producing "tater tots," the potato pieces that are used to make the product are placed in a hot water blanch for three to four minutes in order to gelatinize the starch contained in them. From the blancher the particles are placed on a dwell belt (the first belt) for approximately thirty minutes during which time they are exposed to forced circulating air so as to cool them. After this, they are subjected

---

1. A "tater tot" is a cylinder shaped product, approximately one inch high, composed of riced potato pieces, which is french fried then frozen and packaged for commercial sale.

to a second, similar cooling process for ten to twenty minutes. These cooling procedures are used in order to retrograde the starch found in the potatoes. Following the cooling, the pieces are riced into the desired size, the other ingredients added, and the "tater tots" formed. They are then fried, frozen and packaged.

The only evidence in the record concerning the moisture content of the pieces of potato following the blanching and exposure to forced circulating air was the deposition of Evan Gheen, the production and market coordinator of Ore-Ida, and the testimony of Dr. Irvin Feustel, an expert in food processing who testified on behalf of the defendants. Gheen, in his deposition which was read into the record at the trial, when asked if the process of exposing the pieces to forced circulating air would reduce their natural surface moisture, stated that there *could* be some reduction. When asked if there would be any dehydration of the product in the first cooling stage, he stated that there would be none but that there may be some in the second stage. Dr. Feustel testified that the use of a water blanch would actually increase the amount of moisture in the pieces.

 When a motion for judgment n. o. v. is addressed to the court, the motion admits the truth of the adverse evidence and every inference that may be legitimately drawn therefrom. Mann v. Safeway Stores, Inc., 95 Idaho 732, 518 P. 2d 1194 (1974). Any conflicts in the evidence will be resolved in favor of the party against whom the motion is made. Swa v. Farmers Ins. Exchange, 93 Idaho 275, 460 P.2d 410 (1969). The only evidence concerning the reduction in the moisture content of the pieces is the testimony of Gheen who stated that there might be some surface moisture removed but no dehydration of the product itself and the testimony of Feustel who testified that the moisture content of the potato pieces after they are processed would actually be greater than that of freshly cut, untreated potatoes.

Therefore, there is no substantial, competent evidence supporting the verdict reached by the jury that the respondents' production of tater tots was included in appellants' claim 4 of patent reissue No. 23,890 because there was no evidence that the pieces of potatoes after being blanched and subjected to forced circulating air had a moisture content of less than that of freshly cut, untreated potatoes. This evidence is crucial in order to find that the respondents' process for making tater tots is within the scope of the claim. There is no evidence of the moisture content of the freshly cut, untreated potatoes and no evidence of the moisture content of the pieces after being subjected to air currents. Thus the trial court did not err in granting defendants' motion for judgment n. o. v. with respect to claim 4.

 Appellants argue, however, that the respondents' failure to produce certain production guides which plaintiffs-appellants had sought during discovery will supply the inference that respondents' processes came within the ambit of claim 4 and that the trial court erred when it refused to instruct the jury that they could draw such an inference. Appellants first sought the guides in 1967 after several of respondents employees indicated in depositions that they existed. Appellants later obtained a court order for their production pursuant to I.R.C.P. 34. Respondents then submitted a document which contained the production specifications, but which appellants claimed were not the guides. Appellants then served a subpoena duces tecum demanding that the guides be produced, but the subpoena went unanswered. Respondents argue that the production specifications were the only guides in existence due to the fact that the variable nature of the potato processing business make guides in appropriate. In the pre-trial order entered by the district judge and the amendments thereto, no mention was made of the guides and no issue was framed regarding the failure of respondents to produce them. Then, after the appellants had rested their case, they made a motion pursuant to I.R.

C.P 37(b)(2) to establish the fact that the guides would show that the processes used by respondents were identical to and within the scope of one or more of the claims of the patents. The trial court denied this motion as not timely made and because appellants had failed to show that the guides existed.

I.R.C.P. 37(b)(2) provides in part:

"Other consequences.—If any party or an officer or managing agent of a party refuses to obey an order made under subdivision (a) of this rule requiring him to answer designated questions, or an order made under rule 34 to produce any document or other thing for inspection, copying or photographing or to permit it to be done, or to permit entry upon land or other property, or an order made under rule 35, the court may make such orders in regard to the refusal as are just, and among others the following; (i) An order that the matters regarding which the questions were asked, or the character or description of the thing or land, or the contents of the paper, or the physical or mental or blood condition sought to be examined, or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order."

The power to deny or grant such relief lies within the sound discretion of the trial court. Haney v. Woodward & Lothrop, Inc., 330 F.2d 940 (4th Cir. 1964). There is no time period specified in which a motion pursuant to Rule 37(b)(2) must be made. However, the motion was not made until after plaintiffs-appellants had rested their case, resulting in a gap of more than three years between the time the documents were first sought and the time of the motion. Moreover, the plaintiffs-appellants failed to raise the issue in the pre-trial order. Therefore, we cannot say as a matter of law that the trial court abused its discretion in denying appellants' motion and we therefore affirm that decision.

Appellants reissue patent No. 23,891 contained the following claim which was "claim" 5:

"(5) In a process for preserving white potatoes for subsequent cooking which process includes quick freezing of cut pieces at temperatures below zero degrees F. the preliminary steps of subjecting cut pieces to live steam for a period of two to three minutes at temperatures of approximately 210° F. to inactivate the enzymes without seriously deteriorating from the quality of the raw potato, and subjecting the cut pieces to forced circulating air to remove moisture in the surface of the cut pieces."

Appellants claimed and the jury found that the production of tater tots, southern style hash browns, patties and french fries were included within the scope of this claim. However, the district court granted respondents' judgment n. o. v. as to this claim on the grounds that the evidence showed that in the years since 1960, which are the only years for which appellants could recover, the respondents used a hot water blanch rather than the steam blanch described in claim 5. Appellants had claimed that the steam and water blanches were equivalents so that the use of the water blanch would be within the scope of the claim. The trial court ruled, however, that the actions Henry Chase took in obtaining the patent in its reissue estopped appellants from claiming the equivalency. This estoppel is known as the doctrine of file wrapper estoppel.[2]

When Henry Chase first applied for the patent which ultimately was to become pat-

---

2. The "file wrapper" is the written record of preliminary negotiations between the applicant and the Patent Office. 69 C.J.S. Patents § 202 fn. 73.

"File wrapper estoppel" precludes a claim of equivalency on items expressly excluded from "claims" during the preliminary patent negotiations. The exclusion is evidenced by the record of the negotiations, the "file wrapper."

ent reissue No. 23,891 containing the claim 5 at issue here, he submitted a claim describing a steam blanch. During the course of his negotiations with the patent office, he attempted to amend this claim to describe a hot water blanch rather than a steam blanch. This amendment was rejected by the patent office as new material not covered in the original application. Chase then canceled the claim and did not contest the rejection of the proposed amendment, as he could have done.

In 1954, Henry Chase applied for a reissue of this patent. In doing so, he submitted a claim which described subjecting the pieces to sufficient heat to inactivate the enzymes. This proposed claim was rejected as being too broad in that it failed to limit the claim to the use of live steam which was disclosed in the specifications accompanying the application. In rejecting the claim, the patent examiner stated: "It is axiomatic that a claim must be commensurate in scope with the disclosure." Chase did not appeal this rejection as he was entitled to. Rather, he submitted a new claim limited to steam blanches.

Appellants claim that the trial court erred when it ruled that the doctrine of file wrapper estoppel bars them from claiming that a water blanch is equivalent to a steam blanch.[3] According to them, the doctrine is only applicable where a claim has been rejected because of prior art (prior patents and literature) and not to technical revisions which appellants argue was the case here. Appellants cite numerous cases in support of this proposition. In Trio Process Corp. v. L. Gold-

stein's Sons, Inc., 461 F.2d 66, 75 (3rd Cir. 1972) the court stated:

"The doctrine of file-wrapper estoppel provides that where a patentee abandons or redrafts a claim more narrowly to avoid rejection on the basis of prior art, then the substance of the claim as originally drafted that was thereby excluded cannot be recaptured by resort to the doctrine of equivalents. [Citing cases].

"The doctrine is based on the theory that the prior art is either in the public domain or already patented, so that the patentee may not claim it as part of his invention. By redrafting or abandoning a claim in the face of a prior art rejection, the patentee is conceding that he has not invented what he thereby disclaims, and therefore will not be heard to assert, at a later date, what he disclaimed as his invention. Accordingly, for 'file-wrapper estoppel' to become operable, it is necessary, at the least, that a claim have been narrowed to avoid the prior art. [citing cases.]"

In Ellipse Corp. v. Ford Motor Co., 452 F.2d 163, 168 (7th Cir. 1971), the court stated:

"The doctrine of file wrapper estoppel is that an applicant who acquieses in rejection of his patent claim and accordingly modifies it to secure its allowance, will not subsequently be allowed to expand (or narrow) his claim by interpretation to include limitations originally given up, or their equivalents. [citing cases.] A necessary condition for the establishment of a file wrapper estoppel is that the patentee must have narrowed

3. The doctrine of equivalents was described in Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 607, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) as follows:

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of a patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make

unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and outside the reach of law. * * *

"The doctrine of equivalents evolved in response to this experience. * * * The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' "

(or broadened) his claim in response to an objection by the Patent Office in order to obtain the patent. [Citing case.] The application of the doctrine is limited to changes made to overcome rejections by the Patent Office because the claim was anticipated by the prior art [citing case]. It will not apply where changes in the claim are directed to merely overcoming difficulties in particular wording or indefiniteness, [citing cases], or adhering to the most descriptive recitation of his (patentee's) structure."

From these cases and the others cited by appellants, it is apparent that some courts have construed the doctrine of file wrapper estoppel as applying only when a claim has been narrowed or abandoned because of prior art. A more liberal view was taken by the U. S. Supreme Court in Schrieber-Schorth Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 221, 61 S.Ct. 235, 239, 85 L.Ed. 132 (1940), wherein the court stated:

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent. [citing cases.] The patentee may not, by resort to the doctrine of equivalents, give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amounts to a disclaimer. [citing cases.] The injurious consequences to the public and to inventors and patent applicants if patentees were thus permitted to revive cancelled or rejected claims and restore them to their patents are manifest."

A similar view of the doctrine was taken by the Second Circuit Court of Appeals in Tampax v. Personal Products Corp., 123 F.2d 722, 723 (2d Cir. 1941) when the court stated:

"The doctrine of 'file-wrapper estoppel' depends upon the fact that, when an applicant has accepted the rejection of a broad claim he may not later assert that another claim, deliberately restricted to secure its allowance, is its equivalent; and that argument is as cogent when the claim is transplanted into a new application as when it is amended in the original."

Again, in Henriksen, et al. v. Cory Corp., 327 F.2d 409 (7th Cir. 1964), this view was taken when the court stated:

"Pertinent is the language in Hubbell v. United States, 179 U.S. 77, at pages 83–84, 21 S.Ct. 24, at page 27, 45 L.Ed. 95 where the Court stated: ' * * * [L]imitations imposed by the inventor, expecially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor and in favor of the public, and looked upon as in the nature of disclaimers.' " 327 F.2d at 412.

In the *Hubbell* case cited in *Henriksen*, the court stated:

"An examination of the history of the appellant's claim, as disclosed in the file wrapper and contents, shows that, in order to get his patent, he was compelled to accept one with a narrower claim than that contained in his original application; and it is well settled that the claim as allowed must be read and interpreted with reference to the rejected claim and to the prior state of the art, and *cannot be so construed as to cover either what was rejected by the Patent Office or disclosed by prior devices.* [citing cases.]

"It is quite true that, where the differences between the claim as made and as allowed consist of mere changes of expression, having substantially the same meaning, such changes, made to meet the views of the examiners, ought not be permitted to defeat a meritorious claimant. While not allowed to revive a rejected claim by a broad construction of the claim allowed, yet the patentee is entitled to a fair construction of the terms

of his claim as actually granted." Hubbell v. United States, 179 U.S. 77 at 80, 21 S.Ct. at 25 (1900). (Emphasis ours) Then, the U. S. Supreme Court went on to quote from Shepard v. Carrigan, 116 U.S. 593, 6 S.Ct. 493, 29 L.Ed. 723 (1886), when it stated:

" 'If an applicant, in order to get his patent, accepts one with a narrower claim than that contained in his original application, he is bound by it. If dissatisfied with the decision rejecting his application, he should pursue his remedy by appeal.' " 179 U.S. at 83, 21 S.Ct. at 26.

The most recent U. S. Supreme Court decision utilized both prior art and rejection as bases for "file wrapper estoppel." In Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed. 2d 545 (1966), the court stated:

"It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. [citing cases.] Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. . . . Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220–221, 312 U.S. 654, 61 S.Ct. 235, 239–240, 85 L.Ed. 132 (1940)."

As the court noted, the patentee obtained his patent only by accepting the limitations imposed by the Examiner. The claims were drafted to reflect the limitations and preclude assertion of a broader view of the invention. Major emphasis is placed on the inventor's acceptance of the Examiner's rejections.

 We believe that the construction of the doctrine of file wrapper estoppel as described in *Hubbell* and *Graham* is correct if the doctrine is to achieve the purpose ascribed to it in Trio Process Corporation v. L. Goldstein Sons, Inc., *supra*. That purpose being to prevent one who has claimed one thing as his invention and who has specifically rejected claiming some other invention, from later claiming both. If he had wanted to remove both from the public domain, he should have claimed both. To allow him to later claim both would be a fraud upon the public. We do agree with appellants, of course, that the doctrine does not apply to mere technical changes in the wording of the claims. However, we cannot agree with them that it is strictly limited to situations wherein a claim is rejected because of prior art. We believe that the doctrine applies so that one may not by interpretation broaden a patent over what was issued by the patent office.

 Appellants argue that the actions of Chase in abandoning his proposed amendment substituting a hot water blanch for a steam blanch, and his acquiescence to the claim filed describing a steam blanch, was merely technical. According to them, the difference in terms makes no difference in the scope of the claim, that it was done merely to meet the technical language requirements of the patent examiner. Therefore, the doctrine of file wrapper estoppel, even if it is not limited to changes made to overcome prior art, would not apply in this case. With this, we cannot agree. When Chase first applied for his patent, he described a steam blanch. By way of amendment, he sought to change this to a hot water blanch. This amendment was rejected by the examiner because it was new material not covered in the original application. Obviously the examiner felt that a hot water blanch was not included within the scope of a steam blanch and that they were not equivalents. Chase could have appealed this but he chose not to. Then, when he applied for the reissue patent, he again attempted to change his steam blanch claim. This time he described the processes as adding sufficient heat units to the potato pieces to inactivate the enzymes. This was again rejected by the examiner as not being commensurate with the scope of his disclo-

sures. Again, the examiner felt that it was outside the scope of his patent and again Chase failed to appeal that determination. It is obvious from the file wrapper that the examiners felt that a hot water blanch was outside the scope of what he claimed in the original patent. Chase's acquiescense in their decision and his failure to appeal it estops appellants from claiming that steam and water blanches are equivalents. To fail to apply the doctrine of file wrapper estoppel in this case would be to allow appellants to expand the scope and meaning of their patents beyond that which was claimed when the patents were issued.

We therefore conclude that the trial court correctly applied the doctrine of file wrapper estoppel to claim 5 when it ruled that appellants could not claim that the hot water blanch used by respondents as equivalent to the steam blanch described in claim 5. Since there was no evidence in the record upon which the jury could find that respondents used the steam blanch from 1960 through 1965, there is no evidence supporting their determination that respondents processes were included in claim 5 of patent reissue No. 23,891. Therefore, the trial court correctly granted respondents' motion for judgment n. o. v. as to that claim and we affirm that decision.

Appellants have also assigned as error the action taken by the trial court in refusing to allow the jury to consider whether tater tots were included within the scope of claim 6 of reissue patent No. 23,891. Claim 6 provides:

"(6) A frozen potato pattie comprising, substantially non-cooked potato shreds cohering in a pattie form and in frozen state, and in which the enzymes of said shreds are inactivated while the shreds substantially retain the original characteristics of the raw potato."

Claim 6 is a product claim in that it describes a finished product rather than a process for making that product. In order to be within the scope of claim 6, the prod-

uct must be a frozen potato pattie comprised of substantially non-cooked potato shreds that substantially retain the characteristics of the raw potato.

The trial court apparently granted respondents' motion to remove tater tots from claim 6 because it did not think the evidence showed that tater tots were comprised of potato shreds. This was error. Product specification No. 8 which respondents submitted to appellants and which was admitted into evidence as appellants' exhibit No. 96 clearly indicates by respondents' own admissions that tater tots are composed of potato shreds. Under the heading of General Appearance, the following description of tater tots is found:

"The external texture may tend towards smoothness or may be characterized by slightly protruding potato shreds or small chunks which do not exceed 1⁄16 inch in length from the surface. The exterior color is cream to golden with protruding pieces being slightly darker. The internal texture is described as having the shreds or chunks imbedded in a matrix of fine or mashed potato particles. The interior is white and free from all grayness."

And under the heading of Texture, there is the following description:

"The internal texture of the properly reconstituted Tater Tots should have distinct and individually identified shreds or chunks so that when mashed with the fingers after reconstitution, a minimum of four hard pieces can be felt. A smooth or shredless texture is undesirable."

From these two descriptions submitted by respondents, it is obvious that tater tots do in fact contain potato shreds and the trial court erred in concluding they did not.

Respondents maintain, however, that even if "tater tots" contain potato shreds, the question of whether they are included within claim 6 should not have been submitted to the jury because the evidence shows that they do not substantially retain the characteristics of raw potatoes. Re-

spondents point out that in the preparation of "tater tots," pieces that comprise them are blanched in water at temperatures of 198 to 205° F. for three to four minutes and later they are placed in fryers containing oil at temperatures from 365 to 390° F. for one to two minutes. Therefore, they could not substantially retain the characteristics of a raw potato. Appellants argue that the evidence shows that the blanching did not cook the potato pieces, that it merely inactivated the enzymes and that respondents' employee Gheen testified that the tater tots are in the fryers for only forty to fifty seconds and the purpose was only to give them an oil coating and to achieve the desired color and crispness and, therefore, the evidence shows that the tater tots do substantially retain the characteristics of a raw potato.

There is, obviously, conflicting testimony as to whether or not the tater tots substantially retain the characteristics of a raw potato. This is a factual determination which should have been left for the jury and therefore the trial court erred when it removed the issue from their consideration. We therefore reverse the trial court's action in removing from the jury the question of whether or not tater tots were included within claim 6.

Respondents have filed a cross appeal contending that the trial court erred when it failed to rule that claims 4, 5 and 6 were invalid as a matter of law because the patents were invalid. We have already held that plaintiffs are not entitled to recover under claims 4 and 5 and although we are aware of those cases which have held that the validity of a patent should always be determined, Bresnick v. United States Vitamin Corp., 139 F.2d 239 (2nd Cir. 1943), we think the better practice is to refrain from ruling on a patent's validity if unnecessary. Tappan Co. v. General Motors Corp., 380 F.2d 888 (6th Cir. 1967). Since we have ruled that defendants owe no royalties on claims 4 and 5, it is therefore unnecessary to rule on their validity.

Because we have determined that the jury should have been allowed to judge whether tater tots were included within claim 6 and because the jury found that the potato patties and regular shredded hash browns produced by respondents were included within that claim, we must now determine whether claim 6 is valid. In order for a patent to be valid, the claimed invention must be novel, possess utility, and be non-obvious. 35 U.S.C. §§ 102, 103; Graham v. John Deere Co. of Kansas City, *supra*. In addition, it must not be vague or uncertain. General Electric Co. v. Wabash Co., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1938). A patent is presumed valid and any party asserting its invalidity has the burden of proof. 35 U.S.C. § 282.

Respondents contend that claim 6 is invalid because it lacked novelty, was obvious to one skilled in the art, and was vague. As for its lack of novelty and its obviousness, respondents claim that the Miller patent, 2,006,146 issued in 1935, would teach one skilled in the art such a product as claimed in claim 6. In the Miller patent, the process of blanching potato pieces for approximately three minutes in a steam blanch of approximately 225° F. is described and then canning the product, or using other unspecified modes of preserving, is described. Respondents' expert Smith testified that the step of quick freezing the product was known at the time Chase obtained his patents. Therefore, respondents argue that claim 6 lacked novelty and was obvious to one skilled in the art.

Although the question of the validity of a patent is ultimately one of law, Graham v. John Deere Co. of Kansas City, *supra,* we do not feel we can or should ignore completely the findings of the jury who heard the evidence and held that claim 6 is valid. Moore v. Schultz, 491 F.2d 294 (10th Cir. 1974). In determining whether claim 6 is novel and not obvious to one skilled in the art, we must first determine

the state of the prior art at the time Chase obtained his patents. It is true that the Miller patent dealt with potato patties, but these were to be canned or preserved by some means other than freezing. A reading of that patent clearly indicates that it did not anticipate quick freezing. The Howard patent No. 2,477,605, which was issued August 2, 1949, teaches quick freezing of partially dehydrated potatoes, but it makes no mention of potato patties, the product claimed in claim 6. The MacBean patent No. 2,403,871, issued in 1946, describes blanching but does not deal with potato patties. And, the Wittenburg patent No. 1,372,112, issued in 1921, teaches washing the pieces to remove excess starch and then dehydrating them, but again no mention is made of any product.

We believe that when these patents are considered in conjunction with the presumption of validity and the finding by the jury that claim 6 is valid, respondents have failed to prove it invalid. None of the prior art taught frozen potato patties. The fact of their commercial success is a factor in concluding that they were not obvious to one skilled in the art, and that claim 6 was in fact a significant breakthrough. This fact is significant, as stated in Graham v. John Deere Co. of Kansas City, *supra,* at pages 17 and 18, 86 S.Ct. at page 694:

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; in the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

The failure of anyone to produce such a product before Chase obtained his patent indicates that the product claimed in claim 6 was in fact non-obvious.

Respondents also argue that the use of the words "substantially" and "approximately" in the claim renders it vague and therefore invalid under 35 U.S. C. § 112. However, the jury in instruction No. 21 was told that a claim must be definite in what it claims in order to be valid. They found the claim to be valid. Obviously they felt that it sufficiently informed the public of what was being claimed and although their finding is not binding on this Court, Graham v. John Deere Co. of Kansas City, *supra,* we do feel that it demonstrates that defendants have failed to prove, as it must under 35 U.S.C. § 282, that the claim is vague and therefore invalid. We therefore conclude that claim 6 was novel, non-obvious, and was not vague. Therefore, it is a valid claim and the trial court did not err in so ruling.

## CONCLUSION

We affirm the rulings of the trial court that appellants' claims prior to June 30, 1960, are barred by the statute of limitations and that appellants' claims are restricted by the license agreement to respondents' production at its Ontario, Oregon plant. In addition, we affirm the decision of the trial court granting defendants' (respondents') judgment n. o. v. as to claims 4 and 5. We therefore deem it unnecessary to discuss the trial court's alternate grant of a new trial as to claims 4 and 5. We reverse the trial court's decision to remove from the jury the question of whether tater tots are included within claim 6 and we affirm the decision of the trial court that claim 6 is valid. The case is therefore remanded to the district court for further proceedings consistent with this opinion. Reversed and remanded. No costs allowed.

SHEPARD, C. J., and McQUADE, McFADDEN, and BAKES, JJ., concur.